

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00016-CV

_____

IN THE INTEREST OF S.S., A CHILD

On Appeal from the 76th District Court
Titus County, Texas
Trial Court No. 37,692

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

James and Julie appeal from the trial court's order terminating their parental rights to their daughter, S.S.[1]  Both parents contend the evidence is legally and factually insufficient to support the trial court's findings that they (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child, (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical and emotional well-being of the child, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parents to obtain the return of the child who had been in the temporary managing conservatorship of the Texas Department of Family and Protective Services (the Department) not less than nine months as a result of the child's removal from the parents under Chapter 262 of the Texas Family Code for the abuse or neglect of the child.  *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (West 2014).  We affirm the trial court's judgment because we find (1) that sufficient evidence supports at least one finding of a statutory ground for termination of James' and Julie's parental rights to S.S. and (2) that the trial court did not err in admitting a jailhouse recording of a conversation between James and Julie.

*(1)*    *Sufficient Evidence Supports at Least One Finding of a Statutory Ground for Termination of James' and Julie's Parental Rights to S.S.*

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Indeed, parents have a fundamental right to make

---

[1]We refer to the child by her initials and to the parents by fictitious names to protect the privacy of the child.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014).

decisions concerning "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* at 500. "'[I]nvoluntary termination statutes are strictly construed in favor of the parent.'" *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20).

In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West 2014); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). "Clear and convincing evidence" is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding if a

reasonable fact-finder could do so, and disregard evidence that the fact-finder could have reasonably disbelieved or the veracity of which could reasonably be doubted. *J.P.B.*, 180 S.W.3d at 573.

In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We consider only that evidence the fact-finder could reasonably have found to be clear and convincing and determine "'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. "[I]n making this determination," we must undertake "'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26).

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "'the rights of natural parents are not absolute; protection of the child is paramount.'" *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

4

James and Julie's relationship, which began when James was twenty-six and Julie was sixteen, was riddled with domestic abuse and illicit drug use.[2] James physically abused Julie for a period of over four years, almost the entire time the couple had been together. The Department became involved after an incident of abuse on June 20, 2013. That afternoon, as Julie was preparing to go to work, she and James got into an argument which ended when James punched Julie in the face and "whipped" her. This physical abuse took place while L.E.S. was in the home. James then took Julie to work, with L.E.S. in the car. Julie refused to go with James when her shift ended at midnight. Instead, she went to the Mount Pleasant Police Department for help. Julie was concerned about L.E.S., because she knew James had smoked methamphetamine in the past, and she was afraid he was high on methamphetamine while L.E.S. was in his care. Julie informed Officer Scott Wadley that she had been assaulted by her husband and that L.E.S. was in James' care after he had been smoking methamphetamine.

L.E.S. was forcibly removed from James and was returned to Julie. The Department was contacted due to the unsafe condition of the home and James' presence in the home. Julie was taken to the SAFE-T shelter in Mount Pleasant. While in the shelter, Julie told David Zavala, a Department investigator, that methamphetamine use was an issue that James had been dealing with "for some time now." Julie signed a Department-issued safety plan, requiring that she remain at the shelter and not return to James. When the shelter director discovered that Julie had been in contact with James by text for the previous five days and planned to leave the shelter with James

---

[2]James was convicted of injury to a child as a result of his relationship with Julie when she was still a minor.

and L.E.S., she contacted the Department. The Department filed a petition for emergency removal, and L.E.S. was placed in foster care.

After the placement, James, Julie, and L.E.S. were each scheduled for drug tests. L.E.S., who was one year old at the time, tested positive for methamphetamine, James tested positive for methamphetamine and marihuana, and Julie tested positive for marihuana.

James and Julie were both given service plans, which they adhered to until September 2013, when James tested positive a second time for marihuana. At that point, James stopped attempting to comply and moved to Dallas in October 2013. In December 2013, the trial court ordered James to have no contact with Julie or with L.E.S.[3] In January 2014, the trial court ordered a monitored return of L.E.S. to Julie, who was pregnant with her second child. Julie's second child, S.S., was born on March 8, 2014.[4]

From the time of the monitored return until S.S. was born, Julie was doing all that was required of her under the plan, and it appeared that she was complying with the no contact order, at least until April 18, 2014, when James, who was ostensibly living in Dallas, was arrested in Tyler. According to Julie, James showed up at her home that evening and asked her for a ride to the bus station so that he could return to Dallas. There is no explanation in the record for James' presence in Tyler, nor is there any explanation for James' knowledge of Julie's whereabouts. Julie

---

[3]The order stated that James was to have no contact with Julie or L.E.S. Julie was aware of the no contact order. The January 7, 2014, permanency hearing order stated that "visitation between [L.E.S.] and [James] . . . is not in the child's best interest" and that "[Julie] . . . shall have no contact of any kind with [James]."

[4]James' and Julie's parental rights to L.E.S. were also terminated. Their respective appeals from that termination order are the subject of a separate opinion, issued of even date herewith, in our cause number 06-15-00015-CV.

6

agreed to give James a ride to the bus station. Julie, L.E.S., and S.S. were seated in the back seat of Julie's car, and James drove. After having been stopped for a traffic violation, James was arrested on outstanding warrants. Julie could not explain why she agreed to give James a ride that evening, but stated that she had no contact with James during the time of the monitored return until that fateful evening.

After his arrest, James was taken to the Smith County Jail. In spite of the no contact order, Julie and the two children visited James at the jail on five different occasions. Julie admitted that she did not think she would "get caught" if she and the children visited James at the jail. At least one of Julie's jailhouse visits with James was recorded and introduced into evidence at trial.[5] On the recording, Julie referred to a "stash" she was saving. She told James, "[T]hat stuff you had back I was saving for me." She stated that "Johnny and them" were asking her for some, but indicated that she told them, "[T]hat's just mine." At trial, Julie denied that the "stash" referred to any type of illegal drug. When asked what the stash was, Julie stated that she could not recall. James and Julie's discussion at the jail also included plans to have a family together when the termination case was concluded. Julie admitted that this was not in the children's best interests.

When Karen Craver, Julie's conservatorship worker, learned of the April 18 incident and Julie's subsequent contact with James at the Smith County Jail, L.E.S. and S.S. were removed and placed in the home of a paternal aunt. In August 2014, after the second removal of L.E.S., Julie again tested positive for marihuana. Craver also testified that, based on review of the jailhouse

---

[5]The propriety of the trial court's ruling to admit the recording into evidence will be addressed later in this opinion.

7

recording, Julie said she had saved James' stash in a U-Haul. Julie was waiting for James to get out of jail so they could use the drugs together.

>       *(a)       Termination of James' Parental Rights Under Section 161.001(1)(E)*

"'Only one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.'" *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.)); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). Because James does not challenge the trial court's finding that termination of his parental rights was in S.S's best interest, we will affirm the trial court's judgment if the evidence is legally and factually sufficient to support termination on at least one statutory ground. The trial court found that James engaged in conduct or knowingly placed S.S. with persons who engaged in conduct that endangered the physical and emotional well-being of S.S. *See* TEX. FAM. CODE ANN. § 161.001(1)(E).

"If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct." *In re J.A.W.*, No. 06-09-00068-CV, 2010 WL 1236432, at *3 (Tex. App.—Texarkana Apr. 1, 2010, pet. denied) (mem. op.) (citing *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). It is not necessary that the conduct be directed at the child or that the child actually suffer injury. Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). Further, termination under

8

subsection (E) must be based on more than a single act or omission. Instead, a "voluntary, deliberate, and conscious course of conduct by the parent is required." *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.)); *see Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 366–67. "In considering whether a relevant course of conduct has been established, a court may properly consider evidence of conduct that occurred both before and after a child's birth." *J.A.W.*, 2010 WL 1236432, at *3 (citing *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *In re S.T.*, 263 S.W.3d 394, 401–02 (Tex. App.—Waco 2008, pet. denied)).

The trial court heard about James' protracted history of domestic violence toward Julie. L.E.S. was in the home on at least one occasion in which James punched Julie in the face and "whipped" her. According to Julie, James' violence toward her was so bad that, "a few times," Julie believed that she was going to die. James' abuse of Julie began when she was sixteen and has continued. Julie was twenty-one years old at the time of trial. Julie reported the abuse on only two occasions because she was fearful that James would kill her.

The fact-finder also heard about James' extensive criminal record and his drug abuse. In addition to his conviction for injury to a child resulting from his relationship with Julie when she was still a minor, James was convicted of burglary of a building in 2001, assault in 2011, unlawful possession of a firearm by a felon in 2014, and endangering a child—L.E.S.—in 2014.[6] While we

---

[6]This conviction stemmed from the act of smoking methamphetamine in the presence of L.E.S., thereby placing L.E.S. "in imminent danger of death, bodily injury, or physical or mental impairment."

9

recognize that imprisonment, standing alone, is not conduct which endangers the physical or emotional well-being of the child, "intentional criminal activity which expose[s] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam) (citing *Allred v. Harris Cnty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)).

James tested positive for methamphetamine in July 2013. At trial, Julie testified that methamphetamine use was an issue that James had been dealing with "for some time now." James used methamphetamine while L.E.S. was in his care, and Julie was aware of this fact and unquestionably knew of the dangers it posed to L.E.S. as evidenced by her report to police officers that she believed this to be the case on the day following the reported abuse by James in June 2013. Disturbingly, L.E.S. tested positive for methamphetamine in July 2013, less than one month from the time Julie reported that James was high on methamphetamine while L.E.S. was in his care.

"'[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct.'" *J.L.B.*, 349 S.W.3d at 848; (quoting *In re N.S.G.*, 235 S.W.3d 358, 367–68 (Tex. App.—Texarkana 2007, no pet.)); *see J.O.A.*, 283 S.W.3d at 345 n.4; *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). "Because it exposes the child to the possibility that the parent

10

may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child")).

Here, the record is replete with evidence of James' abuse of Julie, his repeated criminal behavior (including conduct that endangered a minor), and his abuse of illicit and dangerous drugs. Based on the combined weight of this evidence, the trial court could have easily formed a firm conviction or belief that James engaged in a voluntary, deliberate, and conscious course of conduct that endangered S.S.'s physical and/or emotional well-being.[7]

*(b)*      *Termination of Julie's Parental Rights Under Section 161.001(1)(E)*

Because Julie does not challenge the trial court's finding that termination of her parental rights was in the best interest of S.S., we will affirm the trial court's judgment if the evidence is legally and factually sufficient to support termination on at least one statutory ground. *See O.R.F.*, 417 S.W.3d at 37. The trial court found that Julie knowingly engaged in conduct or knowingly placed S.S. with persons who engaged in conduct which endangered S.S's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E).

---

[7]Although the trial court terminated James' parental rights under sub-sections 161.001(1)(D) and (O) of the Texas Family Code as well, we need not address these grounds as the evidence is legally and factually sufficient to support termination under Section 161.001(1)(E).

Julie maintains that she did nothing to endanger S.S.'s physical or emotional well-being. She contends that S.S. was not yet born when James abused Julie and that S.S. was never exposed to his violent behavior or his abuse of illicit drugs, including methamphetamine. She concedes that she did visit James in jail, that she took S.S. with her on those visits, that she agreed to give James a ride to the bus station April 18, and that she took S.S. with her on that occasion as well. These seemingly innocuous events, she contends, do not amount to clear and convincing evidence supporting termination under Section 161.001(1)(E). We disagree and hold that legally and factually sufficient evidence supports the finding that Julie knowingly engaged in conduct that endangered S.S.'s physical or emotional well-being.

In December 2013, the trial court ordered James to have no contact with Julie or L.E.S., and Julie was aware of this order. On January 7, 2014, the trial court ordered Julie to have no contact of any kind with James. This order was issued contemporaneously with the monitored return of L.E.S. to Julie and was, unquestionably, issued for the protection of L.E.S. from the abusive, dangerous, drug-infested environment created by James' presence in Julie's life. In hindsight, the order, which was clearly needed, was, unfortunately, not enough. James held such sway over Julie that notwithstanding the extreme and brutal nature of his abuse—Julie admitted that, on more than one occasion, she feared for her very life—and notwithstanding the fact that her one-year-old daughter, L.E.S., tested positive for methamphetamine, Julie continued to subject herself to James' abuse and exposed both L.E.S. and S.S. to the physical and emotional dangers that accompanied contact with James.

Although the evidence is conflicting, a reasonable fact-finder could have believed that Julie was living with James during the time she was pregnant with S.S. and that S.S. was living in the household with James and Julie for some period of time after her birth. Nancy Leflett, a bail bondsman who bonded James out of jail on a misdemeanor charge in January 2014, testified that James and Julie were still together at that time. Leflett called Julie's mother when James failed to appear in court at the end of January. Julie's mother did not know the couple's whereabouts. Believing the couple was living in Tyler, Leflett called the Tyler Police Department to transmit this information. Following the January court date, Leflett encountered Julie in the courtroom at a criminal docket call. According to Leflett, she said to Julie, "I know he's with you. I didn't tell her how I knew, I just said I know he's with you." Julie did not deny this statement. In April 2014, after James was arrested in Tyler—where Julie was living—Julie called Leflett. She told Leflett that she had $750.00 to post bond for James and asked Leflett to take care of it. Although Julie testified that she called Leflett at the request of James' mother, Leflett testified that Julie was calling for James. Leflett again told Julie that she knew the two were together. Again, Julie did not deny this statement. In April 2014, when James was arrested, he was ostensibly living in Dallas. Yet, he knew where Julie lived in Tyler, and the record contains no explanation for his presence in Tyler.

When read in context with the entirety of the testimony (1) that James and Julie were in daily contact while she was living at the SAFE-T shelter, (2) that Julie was making plans to leave the shelter with James, (3) that Julie was with James in April when he was arrested, (4) that Julie visited James five times while he was in the Smith County Jail following his April arrest, (5) that

13

Julie attempted to post a bond for James so that he could be released from jail, and (6) that James and Julie discussed having their family together after the Department's case was concluded during one of their jail visits, a reasonable fact-finder could have concluded that Julie was with James for some or all of the time period from January 2014 through April 2014. This evidence, likewise, supports the conclusion that S.S. was living in the household with James continuously or intermittently from the time of her birth.[8]

Not only was she aware of the fact that James exhibited extreme violence, Julie testified that she knew that it was not in her children's best interests to be exposed to this conduct. At trial, Julie plainly admitted that she and James planned on having their family together when this case was over, even though she recognized that such was not in S.S.'s best interest.[9] Stenet Frost, a licensed professional counselor, testified that children who are exposed to domestic violence are more likely to exhibit aggressive and anti-social behavior. Such children are likewise more prone to suffer from depression and to have problems in school. Moreover, girls who are exposed to domestic violence are more likely to someday find themselves in relationships in which they are the victims of domestic violence.

Julie's admission that she planned to reunite with James also meant that S.S. would be exposed not only to domestic abuse, but also to James' use of illegal drugs. We have concluded that James' use of illicit drugs was clearly dangerous to L.E.S.' physical and emotional well-

---

[8]Craver testified that the Department did not recommend L.E.S.'s monitored return, fearing that James would return at or near the time of S.S.'s birth. Craver testified that she visited Julie's home approximately one week prior to James' arrest and that it did not appear that James was in the home.

[9]Julie also testified that she will discontinue all contact with James.

14

being,[10] and exposure to this environment would have the same effect on S.S. *See In re D.J.H.*, 381 S.W.3d 606, 613 (Tex. App.—San Antonio 2012, no pet.) (fact-finder may infer from past conduct endangering well-being of child that similar conduct will recur if child is returned to parent). Further, a parent's failure to remove herself and her children from a violent relationship endangers the physical and emotional well-being of the children. *In re B.E.T.*, No. 06-14-00069-CV, 2015 WL 495303, at *5 (Tex. App.—Texarkana Feb. 5, 2015, no pet.) (mem. op.).

Julie has also exhibited a pattern of drug use, having tested positive for marihuana in July 2013 and again in August 2014, during the pendency of the termination proceedings. Julie likewise referred to her "stash" hidden in a U-Haul trailer in a telephone conversation with James. This evidence supports an affirmative finding that Julie has engaged in a course of conduct which has the effect of endangering S.S. *See In re K.L.*, No. 12-13-00334-CV, 2014 WL 668202, at *3 (Tex. App.—Tyler Feb. 19, 2014, no pet.) (mem. op.) ("Illegal drug use by a parent after the parent has agreed not to use drugs as part of a service plan for reunification with the children is sufficient to prove voluntary, deliberate, and conscious endangerment by clear and convincing evidence."); *In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) ("The trial court could view appellant's actions in violating the safety plan as conduct that endangered the child.").

Julie's inability to cease contact with James is a danger to S.S.'s physical and emotional well-being. Julie clearly planned on reuniting with James after his release from jail; she brought S.S. to the jail, in violation of the court's order that she have no contact with James; she took S.S. with her when James requested a ride to the bus station, also in violation of the court's no contact

---

[10]*See* our opinion issued of even date herewith in our cause number No. 06-15-00015-CV, styled *In re L.E.S.*

15

order; and finally, Julie made plans with James to use drugs with him on his release from jail. We must affirm the trial court's order terminating Julie's parental rights to S.S. pursuant to Section 161.001(1) (E). *See* TEX. FAM. CODE ANN. § 161.001(1)(E).[11]

*(2)*    *The Trial Court Did Not Err in Admitting a Jailhouse Recording of a Conversation Between James and Julie*

Both James and Julie complain of the trial court's admission of an audio/video recording of a conversation they had at the Smith County Jail while James was incarcerated. They contend the video recording was erroneously admitted over their objections that the contents of the recording are subject to the spousal communications privilege. *See* TEX. R. EVID. 504. We addressed this issue in detail in our opinion of this date in cause number 06-15-00015-CV. For the reasons stated therein, we likewise conclude that error has not been shown in this case.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     August 11, 2015
Date Decided:       August 18, 2015

---

[11]Although the trial court terminated Julie's parental rights under grounds (D) and (O) as well, we need not address these grounds as the evidence is legally and factually sufficient to support termination under ground (E).

16