

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00103-CV

_____

IN THE INTEREST OF A.R.G.-A. AND I.A.R., CHILDREN

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. FA-17-43455

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

This is an appeal from a jury's verdict terminating the parental rights of A.A. and J.R.[1] A.A. is the mother of A.R.G.-A and I.A.R. J.R. is the father of I.A.R.[2] A.A. challenges the legal and factual sufficiency of the evidence to support the jury's determination that statutory grounds existed and that it was in the children's best interests to terminate her parental rights. J.R. appeals, maintaining the trial court erred when it allowed a witness to testify in violation of Rule 614 of the Texas Rules of Evidence. Because we find (1) A.A. waived her legal and factual sufficiency challenges, and (2) the trial court did not abuse its discretion when it allowed the complained-of witness to testify, we affirm the trial court's judgment.

On November 18, 2017, the Texas Department of Family and Protective Services (the Department) received a referral alleging the physical abuse of I.A.R., who was approximately two months old at the time. The day before the referral, J.R. had been taking care of both I.A.R. and A.R.G.-A., when I.A.R. began to scream. I.A.R. then began to show signs of rigidity in her extremities and became "slightly unresponsive." Shortly thereafter, J.R. contacted 9-1-1, and I.A.R. was transported to a local hospital by ambulance and then to a children's hospital in Dallas, where she was admitted. A CT scan was performed on I.A.R. revealing signs of a cerebral

---

[1]We refer to the children and the parents by initials in an effort to protect the children's privacy. *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2018).

[2]The biological father of A.R.G.-A is not involved in this case.

convexity subdural hematoma.  Neither J.R. nor A.A. were able to provide an explanation as to how I.A.R.'s injury had occurred.[3]

Following a brief investigation, the Department removed the children from the parents' care[4] and filed an original petition for protection of a child, for conservatorship, and for termination of the parent/child relationship.  In its petition, the Department alleged that, if reunification of the children with their parents could not be achieved, the trial court should terminate the parental rights of both parents because, among other things, they engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical and emotional well-being.  Following a trial, the jury found that the parental rights of J.R. and A.A. should be terminated.[5]  Thereafter, the trial court entered an order and an amended order terminating J.R.'s and A.A.'s parental rights.   This appeal followed.

---

[3]I.A.R. had been involved in a car accident two weeks before the incident; however, the doctor believed the blood around I.A.R.'s brain was "too fresh" to have been the result of the car accident.

[4]Department investigators spoke with the paternal grandmother, the maternal grandmother and step-grandfather, the maternal aunt, and A.R.G.-A.'s biological father in the hopes that a family member could be a temporary caregiver for the children.  With the exception of A.R.G.-A's biological father, who was not in a position to care for the children, none of the individuals were approved by the Department to be the children's caregiver at that time.  Due to I.A.R.'s unexplained head injury while in J.R.'s care and the lack of a suitable alternative caregiver for the children, the Department proceeded with a notice of removal.

[5]The trial court's jury instructions stated:

> For the parent-child relationship in this case to be terminated with respect to [A.A.], the mother of the children [A.R.G.-A. and I.A.R.], it must be proven by clear and convincing evidence that at least one of the following events has occurred:
>
> > 1.  [A.A.] has knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; or
> >
> > 2.  [A.A.] had engaged in conduct or knowingly placed the child  with  persons who engaged in conduct which endangers the physical or emotional well-being of the children.

3

*(1)      A.A. Waived Her Legal and Factual Sufficiency Challenge*

A.A. challenges the legal and factual sufficiency of the evidence (1) to support the alleged statutory grounds for termination of her parental rights and (2) that it was in the children's best interests to terminate her parental rights. "The natural right existing between parents and their children is of constitutional dimensions." *In re L.E.S.*, 471 S.W.3d 915, 919 (Tex. App.—Texarkana 2015, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning "the care, custody, and control of their children." *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial."[6] *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)).

However, as a prerequisite to bringing a legal sufficiency challenge in a parental-rights termination appeal following a jury trial, a parent must raise the issue of legal sufficiency with the trial court in either: "(1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial." *In re A.L.*, 486 S.W.3d 129, 130 (Tex. App.—Texarkana 2016, no pet.) (quoting *In re C.Y.*, No. 02-15-00152-CV, 2015

---

*See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) (West Supp. 2018). In addition, the trial court instructed the jury that it must also find that it was in the children's best interests to terminate A.A.'s parental rights. Likewise, the jury was instructed in the same manner in relation to the termination of J.R.'s parental rights to I.A.R.

[6]"Clear and convincing evidence" is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *L.E.S.*, 471 S.W.3d at 920. "In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "This standard of proof necessarily affects our review of the evidence." *Id.*

4

WL 6394559, at *2 (Tex. App.—Fort Worth Oct. 22, 2015, no pet.) (mem. op.). Here, because A.A. failed to challenge the legal sufficiency of the evidence supporting the jury's verdict in any of the manners specified above, or otherwise, we find that she has failed to preserve her legal sufficiency challenge on appeal.

In addition, Rule 324 of the Texas Rules of Civil Procedure requires a motion for new trial in order to preserve "[a] complaint of factual sufficiency of the evidence to support a jury finding." *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003) (citing TEX. R. CIV. P. 324(b)(2)); *Cecil v. Smith*, 804 S.W.2d 509, 510 (Tex. 1991). Where, as here, A.A. failed to file a motion for new trial raising a factual sufficiency challenge to the jury's verdict, the issue has not been preserved for our review.

A.A.'s points of error regarding legal and factual sufficiency are overruled.

*(2)*     *The Trial Court Did Not Abuse its Discretion When it Allowed the Complained-of Witness to Testify*

On Thursday, October 4, 2018, the Department called Patrick Eadey to testify. Eadey stated that he had known A.A. since high school and that A.A. had a history of being short-tempered. Eadey said that he had witnessed A.A. shove and punch J.R. on two separate occasions. According to Eadey, he never saw J.R. respond to A.A. in a physical manner. Eadey also testified that he observed A.A. hit I.A.R. on November 12, 2017, stating, "[I.A.R.] had been crying and kept crying, and then [A.A.] picked her up and looked at her and yelled at her and told her to shut up. And then [I.A.R.] kept crying and then [A.A.] hit [I.A.R.] on the side of the head with her left hand."[7] Eadey did not observe any injuries to I.A.R. after she had been hit by A.A. Eadey stated

---

[7]A.A. denied that she ever hit I.A.R.

that he did not contact the police after the incident. However, he said he told his girlfriend, Elizabeth Redfearn, about A.A. hitting I.A.R.

The record shows that, on Thursday evening, A.A. contacted Redfearn via Facebook messenger. The messages were read into the record.[8] "So did [Eadey] tell you I hit [I.A.R.]?" Redfearn wrote back, "No, he didn't." A.A. then asked, "And did he drink out of [sic] his dad's?" Redfearn responded, "Yes, all the time but only once at dad's." A.A. then proceeded to send Redfearn a photograph of herself and the children. A.A. informed Redfearn that her lawyer would be subpoenaing Redfearn to testify at trial. Redfearn responded, "It's my pleasure to be able to help you get your kids back." Redfearn and A.A. also spoke on the telephone for around thirteen minutes.

The following day, Eadey informed the trial court that he had seen A.A. violating the Rule by speaking to Redfearn at the courthouse. Eadey explained, "I walked outside to smoke a cigarette and overheard them talking about what was going on in here and [A.A.] telling [Redfearn] what to say when she testified." Eadey continued, "I heard [A.A.] tell Ms. Redfearn to testify the same things that she had, along with telling her to testify that I was doing drugs, as well." Eadey stated that A.A. and Redfearn were aware of his presence while they were speaking to one another. When asked what he heard A.A. say specifically to Redfearn, Eadey responded, "What she had testified about me, about saying that I was doing alcohol, like drinking all the time, and to tell them

---

[8]The record also contains the screen shots of the conversation between A.A. and Redfearn.

that I have also done drugs, as well, and that I'm an abusive person." Eadey said that Redfearn "was just nodding her head yeah, like yes, that she was agreeing to it."

During voir dire examination, Redfearn admitted that she had spoken with A.A. that morning "about like just me getting here and just being very nervous to be here." Redfearn stated that she did not speak to A.A. about the trial and that "they were just talking about [their] lives." Although Redfearn stated that they had talked about the children, she clarified that they were only talking about how they were doing, but nothing about the case or what she would be testifying to during trial. According to Redfearn, the only person she had spoken to about the case was one of the attorneys. She did admit that she had spoken to A.A. the previous night, but the conversation was limited to whether she would testify. Redfearn also conceded that A.A. asked her if she "had heard anything about, like, someone hitting any of [the] kids." Redfearn stated, "[B]ut [A.A.] didn't like say, hey, this is what you need to say; hey, this is what was said or anything like that. It was just a question." When asked if she had talked to A.A. about Eadey, Redfearn responded, "Just that I was scared that he was here." Later that day, the Department rested its case-in-chief.

The trial court determined that Redfearn could testify, but stated, "[T]he parties will be able to go into cross-examination of any bias or information that may have been shared." Redfearn explained that she lived with Eadey between September 2017 and January 2018. During a brief period of time, Eadey and Redfearn lived in an apartment with A.A., J.R., and the children. According to Redfearn, Eadey was an aggressive person who drank to excess. Redfearn stated that, during the time they lived with A.A. and J.R., Eadey would become violent "mainly to [her]." She continued, "He would throw me around. He would hit me." She also said Eadey would

7

destroy things when he became angry. Redfearn stated that she believed it endangered the children when A.A. and J.R. allowed Eadey to be present with the children. Redfearn claimed that, if Eadey testified that he told her that A.A. hit I.A.R., he would not be telling the truth.

J.R. contends that the trial court abused its discretion when it allowed Redfern to testify after she discussed the trial and the witnesses' testimony with A.A., despite the fact that the Rule had been invoked.[9] Rule 614 of the Texas Rules of Evidence states, in relevant part, "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own." TEX. R. EVID. 614.[10] Further, Rule 267(d) of the Texas Rules of Civil Procedure states that "[w]itnesses, when placed under Rule 614 of the Texas Rules of Evidence, shall be instructed by the court that they are not to converse with each other or with any other person about the case other than the attorneys." TEX. R. CIV. P. 267(d).[11] The policy behind the Rule is to minimize "witnesses' tailoring their testimony in response to that of

---

[9]It was brought to the trial court's attention that Redfearn had not been placed under the Rule because, at the time the court instructed the witnesses not to talk to one another about the case, it was not known that Redfearn would be testifying. However, A.A. was aware of the invocation of the Rule, along with its restrictions.

[10]Certain classes of witnesses are exempt from the Rule, including (1) a party who is a natural person or the spouse of such natural person, (2) an officer or employee of a party that is not a natural person and who is designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the cause. TEX. R. CIV. P. 267(b).

[11]After swearing in the potential witnesses, the trial court instructed them as follows:

> The Rule has been invoked. That means you cannot listen to any of the testimony in this case. You can't stay in here and listen to it. You can't go in the hall and have somebody else walk out there and directly tell you or be there standing and chatting about it. You have to, you know, plug your ears. Okay? We don't want you listening to it. You can't come to the door and listen to it from outside. And when you're testifying, even the attorneys can't tell you what someone else has said. We want to know what you have to say without it being considered anyone else's testimony, just yours. And this is a way to make sure that nobody tries to match up their testimony with someone else. No one's saying you're going to try to do that. We're just trying to prevent that from occurring.

8

other witnesses and prevent[ing] collusion among witnesses testifying for the same side." *Drilex Sys., Inc. v. Flores*, 1 S.W.3d 112, 116 (Tex. 1999). If the Rule is violated, a trial court may, taking into consideration the circumstances, allow the testimony of the potential witness, exclude the testimony, or hold the person in contempt. *Id.* at 117.

An appellate court reviews a trial court's admission or exclusion of evidence under an abuse-of-discretion standard. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527–28 (Tex. 2000). An appellate court must uphold a trial court's ruling if there is any reasonable basis in the record from which to do so. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). The erroneous failure to exclude a witness is not reversible unless it is shown to be harmful. *Elbar, Inc. v. Claussen*, 774 S.W.2d 45, 52 (Tex. App.—Dallas 1989, writ dism'd).

According to J.R, "[his] parental rights were negatively affected by Ms. Redfearn's discrediting [Eadey] who functionally absolved [J.R.] of harming I.A.R." There is no question that the two women spoke in person, by telephone, and messaged one another during the trial. But, even assuming Redfearn and A.A.'s conversation violated the Rule, the trial court still had the discretion to allow her testimony after considering all of the circumstances. *See Drilex Sys., Inc.*, 1 S.W.3d at 117. The record shows that, after the trial court discovered the alleged violation, it proceeded to conduct a quite lengthy inquisition as to what had occurred between A.A. and Redfearn. J.R. contends that, following A.A.'s conversation with Redfearn, "Redfearn took the witness stand and testified just as A.A. directed: that Ms. Redfearn had never seen A.A. strike the child, and that Patrick Eaddy [sic] was, essentially, a violent drunk." Eadey, whose credibility was considered by the trial court, stated that he heard A.A. tell Redfearn what to say when she

9

testified. However, according to Redfearn, whose credibility was also considered by the trial court, she did not discuss with A.A. what had been said or asked during trial, and A.A. did not tell her how to testify. Apparently, the trial court believed Redfearn's version of events and found there was little, if any, complicity between A.A. and Redfearn involving the relevant issues in the case. Based on the record before us, we cannot say that the trial court "act[ed] arbitrarily or unreasonably or without reference to any guiding rules or principles" when it allowed Redfearn to testify. *See Texarkana Nursing & Healthcare Center, LLC v. Lyle*, 388 S.W.3d 314, 317 (Tex. App.— Texarkana 2012, no pet.) (citing *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003)).

 J.R.'s point of error is overruled.

 We affirm the trial court's judgment.

       Josh R. Morriss, III
       Chief Justice

Date Submitted:  March 5, 2019
Date Decided:   March 15, 2019