

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00048-CV

IN THE INTEREST OF F.S., A CHILD

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 23C0251-CCL

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

## MEMORANDUM OPINION

The trial court removed F.S.[1] from the care of Father and his wife, Bonnie, after finding that there was an immediate danger to the physical health or safety of the child and that F.S. had been the victim of sexual abuse or trafficking. It also named the Texas Department of Family and Protective Services as his temporary sole managing conservator.[2] About fourteen months later, the trial court terminated Father's parental rights after finding that there was clear and convincing evidence under statutory grounds D and E[3] to support the termination of his parental rights and that the termination of his parental rights was in the best interest of F.S.[4]

In this appeal, Father asserts that (1) there was legally and factually insufficient evidence to support the trial court's findings under grounds D and E and (2) there was legally and factually insufficient evidence to support the trial court's finding that termination of his parental rights was in the best interest of F.S. Because we find that (1) sufficient evidence supported the trial court's findings under statutory ground E and (2) Father waived his challenge to the trial court's best-interest finding, we will affirm the trial court's judgment.

---

[1]All minor children and their parents will be referred to either by their initials or by fictitious names. *See* TEX. R. APP. P. 9.8.

[2]When removed, F.S. was residing with Father and Bonnie, their three children, C.B., J.B, and B.B., and Bonnie's two children, A.L. and E.B. Our cause number 06-24-00047-CV concerns, in part, the appeal of the termination of Father's parental rights to C.B., J.B., and B.B.

[3]*See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) (Supp.).

[4]The trial court also terminated the parental rights of F.S.'s mother, but she is not a party to this appeal.

2

## I. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "This Court is . . . required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (alteration in original) (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the . . . fact-finder[] resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the [fact-finder] could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). Also, we "consider whether disputed evidence is such that a reasonable fact[-]finder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* "In applying this standard, '[a]n appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt.'" *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (alteration in original) (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

4

"'[I]n making this determination,' we must undertake '"an exacting review of the entire record with a healthy regard for the constitutional interests at stake."'" *In re L.E.S.*, 471 S.W.3d at 920 (alteration in original) (quoting *In re A.B.*, 437 S.W.3d at 503). We "must nevertheless still provide due deference to the decisions of the fact[-]finder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)). "We also recognize that . . . the fact-finder . . . may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, '"the rights of natural parents are not absolute; protection of the child is paramount."'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.)).

"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)). "Even so, when the trial court's findings under grounds D or E are challenged on appeal, due process demands that we review the evidence supporting the findings under at least

one of those grounds." *In re A.B.*, No. 06-22-00020-CV, 2023 WL 7475743, at \*2 (Tex. App.—Texarkana Nov. 13, 2023, pet. denied) (mem. op.) (citing *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) ("We hold that due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under [S]ection 161.001(b)(1)(D) or (E) of the Family Code."). "This is because termination of parental rights under these grounds may implicate the parent's parental rights to other children." *Id.* (citing *In re N.G.*, 577 S.W.3d at 234; TEX. FAM. CODE ANN. § 161.001(b)(1)(M)).

## II. Sufficient Evidence Supports the Trial Court's Findings Under Statutory Ground E

### A. Statutory Ground E Requirements

Parental rights may be terminated under statutory ground E "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "'[E]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re L.E.S.*, 471 S.W.3d at 923; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). "It is not necessary that the conduct be directed at the child or that the child actually suffer injury." *In re L.E.S.*, 471 S.W.3d at 923. "Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367). "Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regul. Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso

6

2004, no pet.)); *see Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 366–67. Nevertheless, the parent's conduct includes both the parent's acts and its omissions or failures to act. *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied); *In re N.S.G.*, 235 S.W.3d at 366–67.

"[E]ndangering conduct may include the parent's actions . . . while the parent had custody of older children . . . ." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citing *Boyd*, 727 S.W.2d at 533). "[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (alteration in original). Further, "the parent's conduct need not be directed at the child or actually cause the child injury; '[t]he specific danger to the child's well-being may be inferred from parental misconduct standing alone.'" *In re R.H.*, 693 S.W.3d 846, 856 (Tex. App.—Fort Worth 2024, pet. denied) (alteration in original) (citing *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.)). "Courts may consider a parent's conduct that occurred outside the child's presence or after the child's removal by the Department." *Id.* (citing *In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *4 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.)). Also, "intentional criminal activity which expose[s] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." *In re L.E.S.*, 471 S.W.3d at 924 (alteration in original) (quoting *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam)). "It is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being." *In re A.B.*,

7

125 S.W.3d 769, 775 (Tex. App.—Texarkana 2003, pet. denied) (citing *In re R.G.*, 61 S.W.3d 661, 667 (Tex. App.—Waco 2001, no pet.), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39). Further, "[i]n our analysis under [statutory] ground E, we may also consider a parent's failure to complete relevant requirements of his service plan." *In re S.A.W.*, No. 06-21-00116-CV, 2022 WL 1193667, at \*4 (Tex. App.—Texarkana Apr. 22, 2022, pet. denied) (mem. op.) (citing *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at \*11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.)).

### B. Background

The evidence at trial showed that, after Father was accused of sexual abuse by his nephew, the Department opened cases on F.S. and three of Father's other children, C.B., J.B, and B.B., in October 2022. During the Department's investigation, the children were interviewed at the Texarkana Children's Advocacy Center (the CAC). The children disclosed that they were having sex with each other under their trailer house.[5] As a result, on January 2, 2023, the Department had a family team meeting with Father and Bonnie, who agreed that they would follow through with counseling for the children and all the recommendations of the Department in order to address the children's sexual behavior. However, Father and Bonnie did not pursue counseling for the children until late February, and only after the Department contacted them. When they did, they informed the counselor that it was for the trauma of seeing Father arrested, and they did not mention any sexual behavior.

---

[5]At the time, F.S. and B.B. were four years old, J.B. was six years old, and C.B. was seven years old.

8

Father and Bonnie were also required to put up cameras to be able to watch the children, but they claimed the children kept turning them off. Charlotte Carpenter, whose daughter babysat for Father and Bonnie, helped care for C.B., J.B., and B.B. for about six years. She testified that Bonnie agreed to put up cameras and to lock doors to prevent the children's contact with each other but that, when Carpenter dropped the children off, the camera was dangling, and the doors were not locked. C.B. told her that he unplugged the camera in his room, then slipped out of his room and unplugged the other cameras. After the children would "do their business," he would plug the cameras back in. Carpenter testified that Father and Bonnie knew this happened and were supposed to get wired cameras, but they never did. The girls told her that Father and Bonnie removed the camera from the girls' bedroom and put it in their own room, so the children had sex in the girls' bedroom.

Because Father and Bonnie were not protecting the children, the Department removed them from the home in March 2023.[6] F.S. was placed in the home of E.F., his half-sister, her father, and her father's wife. C.B., J.B., and B.B. were placed with Carpenter. Carpenter testified that she was diligent in following the protocols that the children's counselors had put in place to address their sexual behavior. In July 2023,[7] C.B., J.B., and B.B. told her that Father had touched them inappropriately. C.B. told her that Father had caught him five times while C.B. was dressing and that Father touched his "wienie" and put his hand around it. J.B. said that Father had put his mouth to her chest, touched her "front butt with his hand" and "his wienie,"

---

[6]F.S. began living with Father, Bonnie, and the other children in October 2022.

[7]Father was arrested for the sexual abuse of the children.

and one time forced her hand to touch his "wienie." B.B. said that Father pulled her shorts down and ripped her panties and that they "did sex" on more than one occasion. Carpenter testified that, after the children made the outcries, they became afraid and had escalated nightmares. Although the children improved with counseling, they were terrified to see Father.

J.B. also made an outcry to Maureen Fletcher, a forensic interviewer at the CAC, in July 2023. Fletcher testified regarding the outcry, which revealed additional instances of sexual abuse by Father. C.B. also told Fletcher that Father touched his "wienie" more than one time and that Father told him that, if he told, "he would get in big, big, big, big trouble, the hurt you kind of trouble."

Cecilia Cade, a therapist at the CAC, began counseling C.B. in March 2023 for problematic sexual behavior, which took about nine months, before instituting trauma-focused therapy. She testified that C.B. was not regulated in his emotions and that, when he was asked about visitation with his parents, he became dysregulated and had immediate issues at school and in therapy.

Shane Roach, a therapist at the CAC, counseled both J.B. and B.B. He began counseling the girls in April 2023. He testified that B.B. was initially very shy, fearful, and timid and that, for several sessions, he did joint sessions with J.B. and B.B. to build rapport. It took two months for the girls to become regulated enough to begin a therapy workbook. B.B. was assessed with a CATS 2[8] on which a normal score is around seventeen. B.B scored a thirty, which is high. For a while, B.B. wrote everything down and would not verbally communicate. On two occasions, she

---

[8]Child and adolescent trauma screen 2.

drew a picture of a person she identified as Father, wrote "me being sexual abused" or "sexual abuse me," and drew an arrow. On the back of one, she wrote that she told her mom about the sexual abuse. Roach opined that B.B. and J.B. were in trauma response, that is, fight, flight, or freeze. He testified that, although B.B. had made progress, whenever someone mentioned Father or Bonnie, both girls reverted to their old behaviors.

Regarding J.B., Roach testified that she was also assessed with a CATS 2 and also scored a thirty. J.B. drew pictures regarding Father's sexual abuse, and, on some, J.B. wrote that she was a bad kid. Roach explained that J.B. blamed herself for the sexual abuse. J.B. also drew pictures of Bonnie and herself and wrote "Mom, dad touched me wrong," and Bonnie replied, "Don't tell."

### C. Analysis

In his brief, Father only argues that the evidence was insufficient to support the trial court's findings under statutory ground E because the children's outcries of sexual abuse by Father "were tainted by the actions of the fictive kin placement." Father neither identifies what the tainting actions were, nor does he cite, either in his argument or in his statement of facts, to any place in the record that supports his conclusory claim. Our review of the record shows that, in a brief exchange on cross-examination of a forensic interviewer at the CAC, the interviewer agreed that the actions of an outcry witness might damage the reliability of the outcry, but she also testified that the process used by the CAC ensured the reliability of what goes on in its interviews.

11

In this case, C.B., J.B., and B.B. made their initial outcries to Carpenter, who separated the children and talked with each individually to figure out what was wrong. She denied "grilling" them at any time. There was no testimony regarding the questions she asked the children or what actions she took that may have influenced their outcries. Because the trial court, as fact-finder, "[wa]s the sole arbiter when assessing the credibility and demeanor of witnesses" and had the "opportunity to observe witness testimony first-hand," we defer to its assessment of the reliability of Carpenter's testimony and the outcries of the children. *In re A.B.*, 437 S.W.3d at 503. Further, C.B., J.B., and B.B. made outcries regarding Father's sexual abuse to their therapists at different times over the following nine months, and the treatment of the trauma caused by that abuse became the focus of their therapy.

The majority of the evidence in this case focused on Father's actions toward C.B., J.B., and B.B. while they were in his custody, and the evidence was sufficient to show that Father engaged in a "voluntary, deliberate, and conscious course of conduct" that endangered the children's physical and emotional well-being. *In re L.E.S.*, 471 S.W.3d at 923 (quoting *Perez*, 148 S.W.3d at 436); *see also In re A.B.*, 125 S.W.3d at 775 ("It is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being."). Although F.S. was in Father's custody for about five months, the trial court could consider Father's endangering conduct while he had custody of F.S.'s siblings. *See In re J.O.A.*, 283 S.W.3d at 345. Also, the evidence showed that, in the short time that F.S. was in his custody, Father failed to protect him from the known sexual behavior of his siblings.

Based on this record, the trial court could reasonably form a firm belief or conviction that Father engaged in a course of conduct that endangered the physical and emotional well-being of F.S. As a result, we find that factually and legally sufficient evidence supported the trial court's finding under statutory ground E.[9] We overrule this issue.

## III. The Challenge to the Trial Court's Best-Interest Finding Was Waived

### A. Best-Interest Requirements

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re R.W.*, 627 S.W.3d 501, 516 (Tex. App.—Texarkana 2021, no pet.) (quoting *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at \*7 (Tex. App.—Corpus Christi–Edinburg Feb. 28, 2013, pet. denied) (mem. op.)). "Termination '"can never be justified without the most solid and substantial reasons."'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

"In determining the best interests of the child," courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). These factors are

---

[9]Because we have found that sufficient evidence supports the trial court's finding under statutory ground E, we need not address Father's challenge to the finding under statutory ground D. *See In re A.B.*, 2023 WL 7475743, at \*2.

not exhaustive, and there is no requirement that all of them be proved to terminate parental rights. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *Id.* at 28.

## B.     Analysis

Father also challenges the factual and legal sufficiency of the evidence supporting the trial court's finding that termination of his parental rights is in the best interest of F.S. In Father's argument in support of this contention, he states that, even if the evidence is sufficient to support the findings under statutory grounds D or E, the Department must still show that termination is in the child's best interest, and he notes that proof of the grounds for termination does not relieve the Department from establishing that termination is in the best interest of the child. "However, [he] does not state the *Holley* factors, provide any substantive analysis of how they apply in this case, or make appropriate citations to the record." *In re G.B.*, No. 06-20-00031-CV, 2020 WL 4589761, at *1 n.3 (Tex. App.—Texarkana Aug. 11, 2020, no pet.) (mem. op.) (citing *In re D.V.*, No. 06-16-00065-CV, 2017 WL 1018606, at *7 (Tex. App.—Texarkana Mar. 16, 2017, pets. denied) (mem. op.)). As a result, we find that Father failed to set out in his brief a clear and concise argument in support of his challenge to the trial court's best-interest finding and that this issue has been waived.[10] We overrule this issue.

---

[10]Although Father waived this issue, we have reviewed the entire record and have determined that sufficient evidence supports the trial court's findings.

**IV.    Disposition**

For the reasons stated, we affirm the trial court's judgment terminating Father's parental rights to F.S.

                                        Charles van Cleef
                                        Justice

Date Submitted:    September 9, 2024
Date Decided:      October 9, 2024