**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00245-CV**
_____

**IN THE INTEREST OF J.N.P.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 18-11-15187-CV**

**MEMORANDUM OPINION**

After a bench trial, Appellant W.P. ("Appellant" or "Warren") appeals the order terminating his parental rights to his minor child, J.N.P. ("Jemma") (age 2) and appointing the Texas Department of Family and Protective Services (the Department) permanent managing conservator of the child.[1,2] On appeal, he challenges the admission of certain evidence. We affirm.

---

[1] To protect the identity of the minor, we use a pseudonym to refer to the child and her parents. *See* Tex. R. App. P. 9.8(b)(2).

[2] The mother, "Diane," filed an affidavit of relinquishment of parental rights, the trial court terminated Diane's parental rights to Jemma, and she did not appeal. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K).

1

## Background

The Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship on November 16, 2018, together with an Affidavit in Support of Removal from a representative of the Department. In the affidavit, the Department alleged that it had received a referral with allegations of neglectful supervision of Jemma, a newborn child with special needs. According to the affidavit, Jemma was a newborn with special needs, and her mother, Diane, did not have the cognitive abilities to care for Jemma. The Department representative stated that she had observed Jemma in the hospital, and Jemma's medical chart noted that Jemma had "a large hole in her heart, a defect in her Aortic Valve, and [is] suspected to have Down syndrome." Diane told the Department representative that she had a learning disability, she had bipolar disorder, and she told them she cannot raise her child and her friend Mary was going to take care of Jemma. Mary told the Department representative that Diane "can get very violent, she is deceitful, she lies, and then there are things she just doesn't understand."

The Department representative attended a Family Team Meeting at the hospital about a week later, and the child's father, Warren, also attended that meeting. In the meeting,

> [t]he medical staff explained to the team that [Jemma] actually has two holes in her heart and would need surgery to repair the holes in her

2

heart, constant care, weekly appointments to the cardiologist, and checked at least every three hours to feed and evaluate skin tone and breathing. It was explained that this would be an ongoing situation with [Jemma] due to her heart condition and the Down syndrome.

During the meeting, Warren, Mary, and Diane's mother expressed that they first believed they would be able to work out plans to take care of Jemma, but after listening to the medical staff, "they realized that they had no idea of the seriousness of her condition." According to the affidavit, Warren told the Department "that the amount of care required for [Jemma] as well as his job and financial limitations would not allow him to care for the child." The affidavit alleged that Diane had previously lost custody of two other children in 2002 because of alleged domestic and physical abuse of Diane by her husband and Diane's refusal to leave the abuse.

Warren admitted that he is Jemma's father, and an Acknowledgement of Paternity was filed by Warren. Family service plans for Diane and Warren were filed. The service plan for Warren required in part that he undergo a psychiatric evaluation and follow the recommendation of the assessment and that he maintain a stable, drug-free, and crime-free environment, and refrain from all criminal behavior. The Temporary Order entered by the trial court also required Drug and Alcohol Assessments and Testing and ordered Warren to submit to urine, saliva, or hair follicle testing as directed by the Department.

In December of 2019, Warren tested positive for alcohol in a urine test, and he tested positive for cocaine and cocaine metabolites in a hair follicle test. In

3

January, February, and March of 2020, the Department requested additional random drug tests from Warren, but he did not report for the tests. Then in June of 2020, Warren submitted to a random test and he again tested positive for alcohol in a urine test, and he tested positive for cocaine and cocaine metabolites in a hair follicle test. More than fourteen days prior to trial, the Department filed a Notice of Filing Business Records Affidavit and attached an Affidavit for Business Records, which included copies of the documents relating to the drug testing and test results of Warren.

On the first day of trial, Diane filed an Affidavit of Voluntary Relinquishment of Parental Rights to the Department of Family and Protective Services, relinquishing her parental rights to Jemma. After a bench trial, the trial court signed an Order of Termination terminating Diane's and Warren's parental rights to Jemma and appointing the Department as managing conservator. The court found that Diane had executed an affidavit of relinquishment of parental rights and that termination was in Jemma's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K), (2). The court terminated Warren's parental rights after finding that Warren had knowingly allowed Jemma to remain in conditions that endangered her physical and emotional well-being, that Warren had engaged in conduct or knowingly left Jemma with persons who engaged in conduct that endangered Jemma's physical and emotional well-being, and that Warren had not completed his service plan, and the trial court

4

found that it was in the best interest of Jemma to terminate Warren's parental rights. *See id.* § 161.001(b)(1)(D), (E), (O), (2). The order appointed the Department as sole managing conservator of Jemma.

## Evidence at Trial

### Diane's Testimony

Diane testified that she is Jemma's mother, and that Jemma has a heart condition and was born premature. Diane testified that she knows Jemma has a lot of medical needs, Diane said she had no money and could not take care of Jemma, and she wanted to relinquish her rights. She thought it was best for Jemma to live with her foster parents, but she wanted Jemma's dad to stay in her life.

### Warren's Testimony

Warren testified that he wanted the court to grant him visitation of Jemma, not custody, and he prefers Jemma stay with the foster parents. Warren knew that Jemma always needs two people with her, and he planned for two of his nieces to be with Jemma while he was at work. Warren believed the foster parents are providing Jemma a safe home and are doing a good job taking care of Jemma and they understand her medical needs. He believed Jemma was doing well living with the foster parents, he did not want to move Jemma from their home, but he wanted to keep his rights so he could "see her and love her and take care of her and be of assistance to her."

According to Warren, he was at the hospital three days after Jemma was born, and he had planned to take care of Jemma after he learned Diane was pregnant. Initially, Warren saw Jemma once a week, and then he started seeing her every two weeks. Warren testified that he knew everything about Jemma and that she was fragile, and he had been in meetings with her doctors. Warren recalled a time when he was visiting Jemma and he picked her up and kissed her on the stomach, and he denied that he tossed her into the air. He stated that when he was told not to lift her, he complied. According to Warren, he did not know that by picking her up he had done anything that would put Jemma's life at risk. Warren denied that anyone from CPS had instructed him on how to hold Jemma. According to Warren, he started going to doctor's appointments with Jemma "constantly[,]" but he could not maintain that frequency because of his work schedule and all the things CPS required of him.

Warren testified that he did everything that was asked of him. He received a copy of his service plan, but he did not think it said anything about drug testing. Warren agreed he had not taken a drug test every time CPS asked him to be tested. Warren agreed he had not seen Jemma's doctors for about seven months—since COVID started—his current visits with Jemma are virtual, and he believes her medical condition has improved. Warren understands that Jemma is high risk and takes medicine three times a day, but he could not remember all her medicines.

6

Warren admitted he did not know how to use or clean Jemma's feeding tube. Warren denied using cocaine during the pendency of the case, and he had "no idea in this world[]" why he tested positive for a cocaine metabolite. He agreed he had used crack cocaine for about ten years and the last time was about five years ago. He also agreed he had spent two years in prison for a conviction for burglary.

Testimony of the First Caseworker

Veronica, a Department caseworker for Jemma until July 2019, testified that the Department received an intake when Jemma was born about Diane's mental health, Jemma's medical needs, and that Diane was not going to be able to take care of Jemma. According to Veronica, on several occasions, Jemma needed emergency medical care because she stopped breathing, and she required 24-hour nursing care. The original foster placement put in a discharge notice because they were unable to care for Jemma. Veronica testified that a possible out-of-state placement did not work because Jemma will need to see a cardiologist, a hematologist, go to a Down's syndrome clinic, and have one or two doctors' appointments each week.

Initially, Warren did not identify any family members for placement, and he denied that he was Jemma's father. According to Veronica, Warren was not involved in Jemma's life for the first several months, but he and his girlfriend appeared at the initial permanency hearing. Veronica testified that Warren told her Jemma could not be placed with him because he was living in a group home, but he wanted Jemma to

7

go to a good home. Veronica talked with Warren about his family service plan and what he would have to do to get Jemma back, but Warren told her he did not want to do anything except to meet the foster parents and get updates on Jemma. Warren was initially willing to sign over his rights to Jemma.

Veronica agreed that Warren's service plan required a psychiatric evaluation, following recommendations, individual counseling, and parenting classes, and that Warren did not do any of these things while she had the case, and he told her he could not take time off from work to do his service plan. He also did not maintain a clean home that was safe for Jemma. Veronica testified that Warren had "pretty consistent[]" supervised visitation with Jemma.

Jemma was hospitalized several times while Veronica had the case. Veronica regarded some of Jemma's surgeries as "severe[]" or "life threatening[.]" One time when Warren was visiting Jemma, Veronica had just explained her medical condition to Warren, and he "kind of tossed" the baby in the air, Veronica feared for Jemma's life, and Warren apologized and said he would not do that again after Veronica spoke with him. On another visit after a surgery, Warren had Jemma tucked under his arm and was "aggressively rocking" her. On both occasions, Veronica believed that Jemma's health and well-being were endangered. According to Veronica, she talked with Warren about Jemma's medical issues at every visitation,

8

and Warren knew Jemma had just had the surgery. After observing these incidents, Veronica would not be comfortable with Warren being with Jemma unsupervised.

Veronica had concerns about whether Warren could care for Jemma and take care of Jemma's medical needs, and Veronica did not know if Warren had completed his service plan or addressed his own issues. According to Veronica, if Jemma's caregivers are not trained in her special needs, Jemma could die. She also testified that Warren did not attend any of Jemma's doctor's visits while Veronica had the case.

Veronica met with the foster parents and she regarded them as loving and caring, their home is safe and stable, and they took care of all of Jemma's needs and appointments. The foster mother at the time of trial was a licensed medical professional. According to Veronica, Jemma seemed attached with the foster family and Jemma was a happy baby. Veronica believed that it was in Jemma's best interest for parental rights to be terminated and for her to be adopted by the foster parents.

Testimony of Second Caseworker

Ashley testified that she was the second and current Department caseworker for Jemma's case, and she was assigned to the case in August 2019. Ashley agreed that Jemma's diagnoses include Down syndrome, atrial septal defect, neutropenia, and feeding difficulties, and Jemma was born with trisomy 21, AV canal, and moderate ventricular septal cardiac defect. When she received the case, Jemma was

9

with the foster parents and still had episodes of turning blue that the doctors had not figured out. Jemma requires 24-hour nursing, she will continue to require surgery, and she receives physical and occupational therapy weekly. According to Ashley, Jemma's immune system is compromised, and her white blood cell count puts her at risk of getting sick. Ashley testified that Jemma must always have two people with her.

Ashley did not have any concerns about the foster parents' care for Jemma, and she regards them as very attentive to Jemma's needs. Since being placed with the foster parents, Jemma has made "an extreme amount of progress[,]" she looks for the foster parents, and she is "super happy[,]" crawling, dancing, and trying to walk. Ashley believed that Jemma needed permanency, and it was in Jemma's best interest for the foster parents to adopt Jemma. Ashley testified that Medicaid covers some but not all of Jemma's medical expenses, and the foster parents pay for some things that Medicaid does not pay.

Ashley testified that she thought it was in Jemma's best interest for Warren's parental rights to be terminated because he did not know all the information about Jemma's medical condition, he was unable to have Jemma live with him where he was living, and he has not maintained a home that is safe and stable for Jemma. Ashley believed that Warren minimized Jemma's health needs. Ashley agreed that Warren completed parenting classes and that Warren's psychological and

psychiatric evaluation recommended random drug testing, he did not always go when she asked, and at one point he tested positive. He told Ashley he had used crack cocaine in the past, and he said the positive drug test results were inaccurate. Ashley recalled that she had talked with Warren about his use of cocaine, and he told her that he has a lot of cuts on his hands from his work as a garbage man and that cocaine could get into his system through the cuts. Ashley had concerns about Warren's ability to remain sober if he had rights to Jemma. Ashley agreed that Warren tested positive in a hair follicle test for cocaine metabolite, that he had not taken responsibility for that positive test, and she was concerned.

Ashley described Warren's visitation during the case as inconsistent, and although he could have seen Jemma weekly, he chose to see her every other week, and Ashley was concerned that Warren could not give Jemma more than an hour per week. Ashley recalled that, on one occasion, Warren was visiting Jemma at an office with the foster parents, Jemma was sitting on an armrest, and the foster mother had to tell Warren that Jemma was about to fall off the armrest. Ashley also testified that Warren would pick up toys off the floor and give them to Jemma, but this was a concern because Jemma can get sick easily from toys that are not clean. She also testified that she had to redirect Warren several times during every visit and that his conduct put Jemma in danger. Ashley thought Jemma appeared scared when she was with Warren.

According to Ashley, at one point Warren recommended his niece Nichole as a possible placement, but Nichole stopped attending after making a few visits with Jemma and said she was unable to do more. Ashley believed that Nichole minimized Jemma's health concerns and that Nichole could not provide a safe and stable home for Jemma. Ashley agreed that Warren had attended some of Jemma's doctors' appointments, but not since January 2020, and one time he stayed in the waiting room during the appointment. Warren had told her he works from early morning until late in the afternoon and he was unable to take time off work to attend all his requirements under the service plan.

Testimony of the CASA

The Court Appointed Special Advocate (CASA) testified that she had been on Jemma's case for almost two years, since December 2018. According to the CASA, Jemma has "pretty much the same diagnoses[]" at that time as she did at birth, and besides Down syndrome, she also has heart issues, hypothyroidism, breathing problems, trouble swallowing, and needs a feeding tube. The CASA had been to several of Jemma's medical appointments, and she understood that, although Jemma was almost two years old, she:

> . . . developmentally, she is at a -- about an eight-month level. Her speech is at a -- about a year -- one-year level. She can't swallow very well. She chokes on her own saliva still. You have to watch her all the time, especially now that she's starting to get more active, still has many doctor's appointments, still is being fed every four hours by a G-tube. So it's -- it's a full schedule every day.

12

The CASA testified that Jemma has weak muscle tone and is unstable due to Down syndrome, and she cannot be "rocked vigorously or anything like that." The CASA observed Warren at one visit with Jemma:

> [Warren] had to be redirected three times that I can recall. That was about a month after she had her G-tube placed. Once, he was bouncing her on his knee and that was [] very dangerous. She did not have the neck strength at that point, and she also spits up. So she could have choked. And then the other two times, it was just the way he was holding her that he had to be redirected to hold her a different way.

The CASA did not believe that Warren understood Jemma's needs or had tried to understand her needs. At one doctor's visit, Warren stayed in the waiting room for a while and then left to get lunch and visit another patient. When asked about Warren's parenting skills, the CASA responded that she understood he had to be redirected at each visitation and that he seemed annoyed at being corrected. The CASA also believed that Warren minimized Jemma's medical needs and that without redirection, he places Jemma in danger.

The CASA also observed Jemma with the foster parents, and she believed that Jemma is "very bonded[]" with them. The CASA thought the foster family was stable, committed, and attentive. The CASA believed that termination of Diane's and Warren's parental rights was in Jemma's best interest because

> . . . she has so many medical needs, [] not just concerned about his drug use, but also he tested positive for alcohol in the middle of the day. [S]he needs to be watched 24/7. I don't think he can do that, . . . he

13

hasn't even tried to learn what to do with this child and how to care for her.

The CASA believed that Jemma needs permanency, that the foster parents should adopt her, and that Jemma thinks of them as "mom and dad."

Foster Parents' Testimony

The foster father testified that Jemma had lived with him and his wife for almost two years. He and his wife love Jemma and want to adopt her. The foster father is a marine engineer by education, his wife is a healthcare professional, and they have been married for about twenty years. At the time of trial, he was on leave from his position at MD Anderson.

The foster mother testified that she has a nursing degree and has worked as a nurse for more than twelve years, but she stopped working because Jemma requires 24-hour care. She testified that, although she and her husband are not working now, they have their own business. The foster mother testified that Jemma responds to her and her husband and is bonded with their family. One time, the foster mother could hear that Jemma had fluids in her chest and could not breathe, so she and her husband took Jemma to the hospital, where Jemma was admitted and had surgery to help with breathing and circulation.

The foster mother testified that she had seen Warren with Jemma about five times. She recalled that the first time, Warren did not listen to the cautions about how to pick Jemma up. Another time, she expressed concerns to Warren about how

14

to pick Jemma up because he was not carrying her the right way, and he told her she did not have to tell him how to deal with his child. She also observed Warren leaving Jemma on a couch unattended, and Jemma almost fell. According to the foster mother, Warren had to be redirected at every visitation, and she once smelled alcohol on him. She was also concerned because Warren followed them after a visitation.

## Admission of Evidence

In a single issue, Appellant argues that the trial court erred by admitting the drug test results from a third party as business records. According to Appellant, Warren's history of drug use was "a highly contested point[]" during the trial, the drug testing results were the "centerpiece of the Department's evidence[,]" and his service plan did not require him to submit to random drug testing. Warren argues that, in this case, the affidavit accompanying the drug test results "does not indicate the tests were standard for the substances, that they were performed by statutory guidelines, w[h]ere the samples were taken, or even mention the third party testing agent[]" and "[t]here is simply no way that the affiant could have knowledge of the policies and procedures for the documents created by the third party laboratory." According to Appellant, the trial court's error in admitting the reports was not harmless because the drug testing results were the only source of evidence of Warren's alleged drug use.

We review a trial court's decision to admit evidence for an abuse of discretion. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). A trial court abuses its discretion when it acts without regard to guiding rules or principles. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Even if the trial court abused its discretion in admitting certain evidence, reversal is only appropriate if the error was harmful—that is, it probably resulted in an improper judgment. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012) (citing Tex. R. App. P. 44.1, 61.1; *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004)). In determining whether an erroneous admission of evidence is harmful, we review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted. *See Armstrong*, 145 S.W.3d at 144. The erroneous admission of evidence is harmless if the evidence is merely cumulative of other evidence admitted at trial. *See id.*

When the opposing party timely voices a hearsay objection, the other party offering the hearsay bears the burden of showing that the testimony is not hearsay or that it fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004); *see also* Tex. R. Evid. 802. Rules 803 and 804 outline exceptions to the hearsay rule and 803 includes an exception for certain business records that would apply to the drug testing records:

A record of an act, event, condition, opinion, or diagnosis if:
(A) the record was made at or near the time by - or from information transmitted by - someone with knowledge;
(B) the record was kept in the course of a regularly conducted business activity;
(C) making the record was a regular practice of that activity;
(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by an affidavit or unsworn declaration that complies with Rule 902(10); and
(E) the opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.
"Business" as used in this paragraph includes every kind of regular organized activity whether conducted for profit or not.

Tex. R. Evid. 803(6); *see also* Tex. R. Evid. 902(10) (providing that certain business records accompanied by an affidavit as outlined in the rules are self-authenticating).

Additionally, under Rule 803(6), the records of a business may include records created by that business and in some instances records from another business and that are incorporated into the records of the other business. A document authored or created by a third party may be admissible as business records of a different business if: (1) the document is incorporated and kept in the course of the testifying witness's business, (2) that business typically relies upon the accuracy of the document's content, and (3) the circumstances otherwise indicate the document's trustworthiness. *See Nat'l Health Res. Corp. v. TBF Fin., LLC*, 429 S.W.3d 125, 130 (Tex. App.—Dallas 2014, no pet.); *Dodeka, L.L.C. v. Campos*, 377 S.W.3d 726, 732 (Tex. App.—San Antonio 2012, no pet.); *Simien v. Unifund CCR Partners*, 321 S.W.3d 235, 240-41 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (op. on reh'g);

17

*see also Roper v. CitiMortgage, Inc.*, No. 03-11-00887-CV, 2013 Tex. App. LEXIS 14518, at \*38 (Tex. App.—Austin Nov. 27, 2013, pet. denied) (mem. op.); *Ainsworth v. CACH, LLC*, No. 14-11-00502-CV, 2012 Tex. App. LEXIS 2798, at \*\*13-14 (Tex. App.—Houston [14th Dist.] Apr. 10, 2012, pet. denied) (mem. op.); *Nice v. Dodeka, L.L.C.*, No. 09-10-00014-CV, 2010 Tex. App. LEXIS 8922, at \*10 (Tex. App.—Beaumont Nov. 10, 2010, no pet.) (mem. op.) (citing *Abrego v. Harvest Credit Mgmt. VII, LLC*, No. 13-09-00026-CV, 2010 Tex. App. LEXIS 3117, at \*7 (Tex. App.—Corpus Christi-Edinburg Apr. 29, 2010, no pet.) (mem. op.); *Martinez v. Midland Credit Mgmt., Inc.*, 250 S.W.3d 481, 485 (Tex. App.—El Paso 2008, no pet.)).

The trial in this case did not begin until October 14, 2020, and the Department filed a Notice of Filing Business Records Affidavit on September 29, 2020, more than fourteen days before trial, as required by Rule 902. *See* Tex. R. Evid. 902(10)(A). The notice included an affidavit by the custodian of records of Texas Alcohol & Drug Testing Service, Inc. (TADTS). At trial, the Department offered for admission the drug testing results together with the business records affidavit through the testimony of Ashley, the first caseworker for the Department. The business records affidavit was completed by the custodian of records for TADTS and stated in relevant part:

> I am the custodian of records of [TADTS], . . . . Attached hereto are 39 pages of records from [TADTS] regarding hair/urine/oral fluid testing

18

utilizing strict chain of custody procedures, which was performed utilizing GC/MS (gas chrom[a]tography/mass spectrometry) instruments by a Certified Scientist and reviewed by a licensed Medical Review Officer. These said 39 pages of records are kept by [TADTS], in the regular course of business, and it was the regular course of business of [TADTS] for an employee or representative of [TADTS], with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

The exhibit includes "Test Results" reports by TADTS and "Laboratory Report[s]" by Quest Diagnostics for Warren for the dates November 19, 2019, November 26, 2019, December 17, 2019, February 26, 2020, June 24, 2020, July 31, 2020, and September 1, 2020. Two of the TADTS and Quest Diagnostics reports, one on December 2019 and one from June 2020, were positive. The hair follicle tests from both dates were positive for cocaine and a cocaine metabolite, and the two urine tests from those dates were positive for ethyl glucuronide and ethyl sulfate. Also included was a completed Forensic Drug Testing Custody and Control Form that provided collection and chain-of-custody information for each testing date.

When the Department offered this exhibit into evidence, Warren's attorney made the following objection:

Judge, I'm objecting to those. The business record affidavit is completed by clearly an employee of Texas drug and alcohol. I -- let me pull it up. However, there is also -- the drug testing was not actually completed by Texas drug and alcohol; it's by Quest Diagnostics, which is another entity altogether, and there is no way that the individual – the affiant had firsthand knowledge of chain of custody, who took the

19

> samples, what was done with those samples, and then ultimately, the reliability of those documents within the business records from Texas drug and alcohol. So effectively, it's hearsay from Quest Diagnostics inside the hearsay from Texas drug and alcohol. There's an exception for the Texas drug and alcohol but not for Quest.
>
> . . .
>
> . . . my objection is I'd still like it noted as hearsay within hearsay for the -- as to the Quest Diagnostics portion of the documents.

Counsel for the Department responded that it was "their business records [] kept in the course of them providing services for alcohol and drug testing." The Department also argued that chain of custody goes to the weight of the evidence and not its admissibility as a business record. The trial court ruled:

> And I do believe that case law dictates that a business record affidavit can actually -- can contain records from third parties if the affidavit or the sponsoring witness still meets the requirements of this exception. And in reviewing the affidavit for the business records, it appears that it does; so I am overruling the objection.

We cannot say the trial court erred in overruling the objection. The trial court could have concluded that the affidavit by the custodian of records for TADTS was sufficient for the business-records exception. *See* Tex. R. Evid. 803(6), 902(10). Furthermore, the trial court could have concluded that the lab results from Quest Diagnostics were incorporated and kept in the TADTS regular course of business, that the TADTS typically relies upon the accuracy of such document's content, and the circumstances otherwise indicate the document's trustworthiness. *Nice*, 2010 Tex. App. LEXIS 8922, at **11-12. The defense did not challenge the contents of the affidavit from TADTS nor did the defense argue that the business records

exception did not apply to the records of TADTS. We also note that the positive drug test results in the Quest Diagnostics Laboratory Results were cumulative of the TADTS Test Results reports, and of the testimony provided by other witnesses at trial.

Appellant acknowledges in his brief that the trial included "extensive testimony" on the Department's concerns about Warren's drug use and testing. We note that the reporter's record reflects the defense did not object when other witnesses testified about Warren's drug test results. For example, Ashley testified that Warren had told her he used crack cocaine in the past, that he tested positive in a random drug test, and she had concerns about his ability to remain sober if he had rights to Jemma. Ashley also testified that Warren tested positive for a cocaine metabolite during the pendency of this case, and Warren did not object to this testimony at trial. The CASA also testified that Warren tested positive for alcohol in the middle of the day. In addition, the foster mother testified that she smelled alcohol on Warren at one visitation. Therefore, the Quest Diagnostics records that were part of the TADTS business records are cumulative of other records and testimony about Warren's drug use, rendering any error in the admission of the Quest Diagnostics records harmless. *See In re J.F.C.*, 96 S.W.3d 256, 285 (Tex. 2002); *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 474 (Tex. 1998). We further conclude that based on the entire record before us, the record does not reflect that

21

the judgment turned on the admission of the Quest Diagnostics reports. *See Armstrong*, 145 S.W.3d at 144; *see also* Tex. R. App. P. 44.1(a).

Appellant also argues that there is no evidence establishing the reliability of third-party laboratory, citing to *Philpot v. State*, 897 S.W.2d 848, 852 (Tex. App.—Dallas 1995, pet. ref'd). Appellant did not make this objection at trial. Therefore, he has not preserved this argument for appeal. *See* Tex. R. App. P. 33.1; *Wohlfahrt v. Holloway*, 172 S.W.3d 630, 639-40 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (To preserve error, a party's argument on appeal must comport with its argument in the trial court.).

Appellant also argues that the "drug test results were the only affirmative evidence presented by the Department applicable to the grounds for termination or the necessary best interest determination made by the court." We disagree and find that there was clear and convincing evidence that Warren committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. §§ 101.007; 161.001(b).

Because the evidence of statutory grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds. *See In re J.L.V.*, No. 09-10-00316-CV, 2020 Tex. App. LEXIS 2070, at *33 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.). Endangerment arises when a parent's conduct jeopardizes the child's emotional or physical health. *See In re S.R.*,

22

452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *See In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)); *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E requires evidence of a parent's course of conduct that endangers the child. *See In re J.L.V.*, 2020 Tex. App. LEXIS 2070, at **32-33; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). A parent's illegal drug use during the pendency of termination proceedings may establish an endangering course of conduct because it creates the possibility the parent will be impaired or imprisoned and thus incapable of parenting. *See In re S.D.T.*, No. 09-19-00315-CV, 2020 Tex. App. LEXIS 1059, at **10-11 (Tex. App.—Beaumont Feb. 6, 2020, no pet.) (mem. op.); *In re C.M.C.*, 554 S.W.3d 164, 172 (Tex. App.—Beaumont 2018, no pet.); *In re E.R.W.*, 528 S.W.3d 251, 264-65 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (concluding that a parent's use of narcotics and its effect on the ability to parent may qualify as an endangering course of conduct).

Parental rights may be terminated under section 161.001(b)(1)(O) if clear and convincing evidence supports that the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to

23

obtain the return of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(O); *In re C.W.*, 586 S.W.3d 405, 406 (Tex. 2019).

Several factors may be considered when determining whether termination of parental rights is in the best interest of the child, including: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b).

Ashley testified that Warren tested positive for a cocaine metabolite during the pendency of the case, and the CASA testified that Warren had tested positive for alcohol in the middle of the day. In addition, the caseworkers, the CASA, and the foster mother also testified that Warren handled Jemma in a manner that put the child in danger in light of her medical condition, and the evidence established that Warren not only tested positive for alcohol and cocaine on multiple occasions, but also, he failed to take several drug tests as required by the court. A temporary order by the

24

trial court required Warren to submit to urine, saliva, or hair follicle testing as directed by the Department, for analysis by a drug testing laboratory. Warren's service plan required him to undergo a psychiatric evaluation and follow its recommendations and to maintain a stable, drug-free and crime-free environment. Veronica testified that Warren did not always go to drug testing when requested. The trial court could have formed a firm belief or conviction that Warren "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(O); *In re C.W.*, 586 S.W.3d at 406.

Deferring to the trial court's credibility determinations and reviewing the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that Warren, through his individual acts or omissions and a course of conduct, endangered Jemma's physical or emotional well-being. *See In re J.F.C.*, 96 S.W.3d at 266. We also conclude that the disputed evidence that the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Warren endangered Jemma. *See id.*

It is undisputed that Jemma has multiple, serious medical conditions. Warren testified that he was not asking for custody but only visitation rights to Jemma. He

25

also testified that because of his work hours, he was unable to attend all of Jemma's doctors' appointments, he did not know all of Jemma's medications, and he did not know how to feed Jemma or clean her feeding tube. The caseworkers and the foster parents testified that, due to her serious medical conditions, Jemma needs 24-hour care and must have at least two people with her at all times. The caseworkers and the CASA testified that they believed that termination of Warren's parental rights was in Jemma's best interest. The caseworkers and the CASA also testified that Jemma was doing well and had bonded with the foster parents.

Deferring to the trial court's determination of the witnesses' credibility, the evidence at trial was sufficient to produce in the mind of the trial court a firm belief or conviction that termination of Warren's parental rights was in Jemma's best interest. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We overrule Appellant's issue and affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on February 8, 2021
Opinion Delivered March 11, 2021

Before Kreger, Horton and Johnson, JJ.