

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00019-CV

IN THE INTEREST OF A.P. AND J.P., CHILDREN

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 23C1170-CCL

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

The Department of Family and Protective Services filed suit to terminate Mother's and Father's[1] parental rights to their children, Alex and Jack.[2] Following a bench trial, the trial court determined that Mother and Father (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, (3) constructively abandoned the children, and (4) failed to comply with provisions of a court order that established actions necessary for the children's return. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O) (Supp.). The trial court also concluded that termination of Mother's and Father's parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (Supp.).

Mother appeals, but does not challenge the trial court's findings on grounds D, E, N, and O. Instead, Mother only appeals the trial court's finding that termination of her parental rights was in Alex's and Jack's best interests. Because we find that the trial court's best-interests finding was supported by legally and factually sufficient evidence, we affirm the trial court's judgment.

## I.      Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re L.E.S.*, 471 S.W.3d 915, 919 (Tex. App.—Texarkana 2015, no pet.) (quoting

---

[1]Father does not appeal the trial court's determination.

[2]We use pseudonyms to protect the identity of the children. *See* TEX. R. APP. P. 9.8.

2

*Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)).  "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'"  *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial."  *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)).  "This Court is . . . required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'"  *Id.* at 919–20 (quoting *In re A.B.*, 437 S.W.3d at 500).  "[I]nvoluntary termination statutes are strictly construed in favor of the parent."  *Id.* at 920 (alteration in original) (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest."  *Id.* (citing *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)).  "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'"  *Id.* (quoting TEX. FAM. CODE ANN. § 101.007) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)).  "This standard of proof necessarily affects our review of the evidence."  *Id.*

"There is a strong presumption that keeping a child with a parent is in the child's best interest."  *In re A.B.*, 646 S.W.3d 83, 96 (Tex. App.—Texarkana 2022, pet. denied) (quoting *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb.

3

28, 2013, pet. denied) (mem. op.)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

When determining the best interests of the child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). The Department is not required to present proof of each *Holley* factor. *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that" termination of the parent-child relationship was in the best interests of the children. *In re L.E.S.*, 471 S.W.3d at 920 (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a

4

reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (alteration in original) (quoting *In re H.R.M.*, 209 S.W.3d at 109; *In re C.H.*, 89 S.W.3d at 25; *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). To make this determination, we undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *Id.* (quoting *In re A.B.*, 437 S.W.3d at 503).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting

*In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d at 26)).

## II.     The Evidence at Trial

Jill Zarazinski, a caseworker for the Department, testified that the Department became involved after receiving "a report of domestic violence in front of the children." Zarazinski testified that the police had received at least five other reports of domestic violence.[3] According to Zarazinski, one of the children called 9-1-1 during an incident of domestic violence to report that Father had a gun and was choking Mother. Joey Keilbach, a Court Appointed Special Advocate, testified (1) that the children told him that their Father had pulled a gun on their Mother, (2) that Mother admitted that the children were in the home when Father "pulled out the gun multiple times" during instances of domestic violence, and (3) that both children and Mother described that Father threatened to kill Mother while pointing a gun to her head.

Father was arrested for and pled guilty to committing domestic violence and was prohibited by court order from having contact with Mother or the children. Mother had admitted to Zarazinski that Father was not safe and that it was unsafe for the children to be around him. Even so, Zarazinski said Mother and Father ignored the no-contact order. Zarazinski found Father's vehicle at Mother's apartment and decided to pay a visit, but Mother refused to answer the door for Zarazinski. Zarazinski said that Mother and Father had conversed on the phone and that one of the children told her that Father had been in Mother's apartment.

---

[3]Zarazinski testified that Mother's apartment had no electricity, which posed a safety issue for the children, and that the Department paid $700.00 to the electric company to reinstate Mother's service.

Keilbach testified that Mother and Father had spoken while Father was in jail, that they talked about getting back together, and that Father had seen Mother when he got out of jail and had taken her cell phone to read her text messages. According to Keilbach, Mother had unsupervised visits with the children toward the beginning of the case, and the children reported to Keilbach that they had spoken on the phone to their Father during those visits. Three weeks before the trial, Mother told Keilbach that Father had stolen her car.

Although Mother was unemployed, Zarazinski said that seven-year-old Alex and five-year-old Jack were unsupervised and "would disappear for hours or for lengths of time, and mother would have no idea where they were." During the pendency of the case, Zarazinski conducted a routine visit of Mother's apartment and requested to see the children, but they were not there. Mother and Zarazinski called the police and discovered that the children were "two or three blocks over at another apartment." Another time, while the case was still pending, one of the children was found walking down the road and was almost hit by a vehicle. The children were also found unsupervised at a local E-Z Mart at 11:00 p.m., prompting an employee to call the police. After Mother tested positive for methamphetamine use during the pendency of the case, the Department decided that removing the children from Mother's care was in their best interests.

Zarazinski supervised a few visits between Mother and the children and testified, "They weren't horrible, but we did have some problems with bad attitudes, mom saying things to the kids, telling them like this is all your fault, blaming them for the situation."

7

Lavada McClinton, a permanency worker with 4Kids4Families, testified that Mother was provided with a court-ordered plan to obtain the return of her children, which included her participation in randomized drug testing. While Mother completed her parenting classes, McClinton said she was "inconsistent" with her counseling and failed to participate in bi-monthly drug testing requested from August until December 2024. According to McClinton, Mother only completed eight of twenty-four requested drug tests, and one of those tests was positive for methamphetamine, while another test was positive for cocaine and methamphetamine. While her substance abuse evaluation recommended substance abuse counseling, Mother did not attend that counseling.

Kielbach testified that Mother admitted that she used drugs during the pendency of the case. He said that Mother would be upset after returning the boys to the Department after unsupervised visits, "so she would [go] get cocaine" from a friend's house two hours away. He was concerned by Mother's drug use, stating "[Y]ou can't supervise children when you're using drugs."

Zarazinski and McClinton testified that they tried to get Mother to complete the Department's family-based, safety service plan but that Mother failed to do so. As a result, Zarazinski and McClinton both believed that termination of Mother's parental rights was in Alex's and Jack's best interests, and Keilbach agreed with that determination.

McClinton testified that she observed Alex and Jack in their foster placements and that Alex was doing well, but Jack was having "a lot of behavioral issues." Keilbach testified, "[Jack] continually tells the teachers, it's happened three times this week, that he's going to get

8

his dad to come shoot them in the head, and he points his finger at the foster parent and tells her all the time that he's going to kill her." According to Keilbach, Jack was "close to getting kicked out of school" after "recently pull[ing] a wad of hair out of a teacher, like by the scalp" and getting "kicked off the bus for getting into a fight." Keilbach also noted that Alex, who was in the first grade, still could not control his bowel movements. According to Keilbach, Alex and Jack both told him that their removal from their parents was their fault. Keilbach testified that he was concerned with the children "being sexual, pulling out their private parts, the boys, in school and with other children." He believed that being around Father would have a negative effect on the children and that their mental health had been affected "[o]ne hundred percent" by Mother's and Father's actions.

After hearing the evidence, the trial court terminated Mother's and Father's parental rights.

### III.    Analysis of the *Holley Factors*

As for the first factor, Alex and Jack were young, and the record contains no evidence of their desires. The record also does not contain evidence suggesting that they had bonded to their foster placements. As a result, we find the first *Holley* factor neutral. *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.).

The second factor requires us to consider the emotional and physical needs of the children now and in the future. The evidence shows that Alex and Jack had witnessed domestic violence between Mother and Father. Kielbach testified that Alex, who was unable to control his bowels, even though he was in the first grade, reported that Father had pointed a gun at Mother

9

while threatening to kill her. Keilbach and Zarazinski both testified that Jack had behavioral problems because of witnessing the domestic violence. According to Keilbach, both children felt that their removal from Mother and the breakup of the family was their fault, and they were both acting out sexually in school. As a result, the needs of Alex and Jack were great, which shows that the second factor weighs in favor of terminating parental rights.

Yet, as for the third and fourth factors, the record shows that Mother was unable to take care of Alex's and Jack's needs and, instead, posed a danger to them. For example, Mother placed the children in physical danger by failing to supervise them. Although they were young, the record shows that they disappeared from Mother's apartment while she was supposed to be caring for them. Mother's use of cocaine and methamphetamine during the pendency of the case demonstrated that Mother exercised poor judgment and lacked parenting skills. *See In re M.C.*, 482 S.W.3d at 688 ("Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest."). Mother also showed that she was unable to protect the children from Father. Even though there was a no-contact order against Father, and Mother admitted that the children were not safe around Father, she allowed Father to visit her and the children. Keilbach testified that Mother and Father were discussing getting back together, which would again expose Alex and Jack to the potential of witnessing domestic violence. Mother also told the children that the breakup of the family was their fault, which was harmful to their mental health. As a result, we find that the third and fourth *Holley* factors weigh in favor of terminating Mother's parental rights.

10

As for the fifth factor, the Department presented a plan to Mother that required completion before the children could be returned to her. Although Mother completed portions of the plan, Mother failed to undergo substance abuse counseling, refused to submit to regular drug testing, and continued to use drugs. That demonstrated that Mother had programs available to assist her but failed to take advantage of them. We find that the fifth *Holley* factor weighs in favor of terminating Mother's parental rights.

As for the remaining factors, Mother was unemployed, and her car was stolen by Father, which limited her transportation options. There was no evidence that Mother had a plan for the children if they were released to her. Her history of drug use, failure to protect the children from domestic violence, and failure to supervise the children established both that her home was unstable and that the existing parent-child relationship was not appropriate. The Department's plan was to terminate Mother's parental rights so that Alex and Jack could be placed for adoption in a safe and stable home. When weighing those options, we conclude that the trial court was free to find that the Department had a better plan for the children in light of Mother's history. At trial, Mother presented no evidence that would excuse her drug use or her failure to supervise and protect the children. As a result, we conclude that the remaining *Holley* factors weigh in favor of terminating Mother's parental rights.

After viewing all of the evidence in the light most favorable to the best-interest findings, we conclude that it was sufficiently clear and convincing that a reasonable fact-finder could have formed a firm belief or conviction that termination of the parent-child relationship between

11

Mother and Alex and Jack was in the children's best interests.  As a result, we overrule Mother's

sole point of error.

## IV.    Conclusion

We affirm the trial court's judgment.


Charles van Cleef
Justice

Date Submitted:        July 14, 2025
Date Decided:          July 22, 2025