

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00017-CV
_____

IN THE INTEREST OF G.G., G.R., G.G., AND G.G., CHILDREN

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2023-1577-DR

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

The Department of Family and Protective Services filed a petition to terminate Mother's parental rights to her two daughters, Gail and Gloria, and her two sons, Gable and Gary.[1] Following a bench trial, the trial court terminated Mother's parental rights after finding that (1) she knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, and (3) termination of her parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (b)(2) (Supp.).

On appeal, Mother argues that the evidence is insufficient to support either a ground of termination or the trial court's best-interests finding. Because we find that legally and factually sufficient evidence supports the trial court's termination of Mother's parental rights, we affirm the trial court's judgment.

## I. Sufficient Evidence Supports a Statutory Ground for Termination of Parental Rights

In her first point of error, Mother argues that the evidence is legally and factually insufficient to support the trial court's findings that statutory grounds existed to support the termination of her parental rights.

### A. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting

---

[1]We use pseudonyms to protect the identities of the children. *See* TEX. R. APP. P. 9.8.

*Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "This Court is . . . required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (alteration in original) (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920

3

(Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine '"whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations."'" *Id.* (alteration in original) (quoting *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002))) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we must undertake '"an exacting review of the entire record with a healthy regard for the constitutional interests at stake."'" *Id.* (alteration in original) (quoting *In re A.B.*, 437 S.W.3d at 503 (quoting *In re C.H.*, 89 S.W.3d at 26)). "We also recognize that the trial court, as the fact-finder, is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or none of a witness'

4

testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, '"the rights of natural parents are not absolute; protection of the child is paramount."'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d at 26)).

### B.  The Evidence at Trial

Brittany Mosley, an investigator for the Department, testified that she received an intake involving "concerns of drug use with the vulnerable children in the home," specifically that Mother was using methamphetamine and was allowing "strange men into her home." As a result, Mosley began her investigation in August 2023 by going to Mother's home. Mosley testified that Mother opened the door but did not allow her inside. Mosley noticed that Mother had not combed her hair or two-year-old Gloria's hair and that Mother's and Gloria's clothing appeared "dingy and dirty."

Mother refused to provide the name of the men coming into her home and denied the allegations of drug use. She agreed to take a drug test, but her drug test was positive for methamphetamine. Gloria's drug test was also positive for methamphetamine. At that point, Mother admitted she used methamphetamine but claimed that it was only while her children

5

were playing outside. That signaled to Mosley that Mother was using drugs while caring for the children. During her investigation, Mosley learned that Mother had a prior history with Child Protective Services (CPS) involving allegations of drug abuse, had previously been given a family service plan, and had not complied with the provisions of the plan, which resulted in removal of the three oldest children from Mother's home in 2018. Even so, they were eventually returned to her care.

Mosley believed that Mother needed either inpatient or outpatient drug treatment. Jhazmyne Johnson, a caseworker for the Department, built Mother's most recent family service plan with those considerations in mind, which the trial court ordered Mother to comply with on September 27, 2023. Johnson also attempted to discuss the terms of the family service plan with Mother, but Mother canceled the meeting a few times, would not return Johnson's phone calls and text messages, and would not sign the family service plan that Johnson eventually left in Mother's mailbox, despite the trial court's order requiring her compliance.

Johnson testified that Mother failed to complete counseling and parenting classes and had several presumed positive drug tests because Mother failed to take them. Johnson also testified that she observed one visit between Mother and her children, found the visit appropriate, and noticed that the children were bonded to Mother, who was bonded to them. However, Mother admitted that she missed several visits with the children. When asked if she attended visits with her children while under the influence, Mother said, "I don't remember."

The evidence also shows that Mother had several arrests during the pendency of the case. Matthew Prescott, a detective with the Longview Police Department (LPD), testified that on

6

November 10, 2023, he arrested Mother for possession of Xanax, methamphetamine, and ecstasy located in her purse.

Darrell Youngblood, an officer with the LPD, testified that when he stopped Mother on July 11, 2024, for an expired registration, her passenger exited the vehicle and fled on foot. Youngblood said he was able to capture the passenger and discovered narcotics in his pocket. As a result, Youngblood extended Mother's traffic stop to search the vehicle. Youngblood testified that he located a lockbox on the floorboard of the driver's seat where Mother was sitting, obtained the code from Mother, and found a "crystal-like substance" that he identified, based on his training and experience, as methamphetamine. As a result, Youngblood arrested Mother on a third-degree felony charge for possession of a controlled substance.

Mother knew she had a long history of drug use and was addicted to drugs. She testified that she had been placed in two inpatient treatment facilities and was currently residing in a second sober living facility. Mother admitted she had been arrested four times during the pendency of the case and had a pending felony case open for credit or debit card abuse. Mother had obtained a job at Subway, saved to obtain transportation, but had not obtained housing for the children and did not have a plan for them. She was also attending counseling.

Mother testified that Gail wanted to be with her and her siblings and said that Gary wanted to come home. Mother could not imagine being kept from her children and begged the trial court not to terminate her parental rights. According to Mother, the children were depressed and anxious because of their removal, but Mother agreed they would be devastated if they were

7

returned to her only to be removed again. Mother also knew that a relapse would result in jail time and that she would have no plan for the children.

After hearing that evidence, the trial court found that the evidence was sufficient to support statutory grounds for termination of Mother's parental rights.

Mother challenges the trial court's findings under both grounds: D and E.

### C.    Sufficient Evidence Supports the Ground D and E Findings

"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *In re A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.))). Even so, when the trial court's findings under grounds D or E are challenged on appeal, due process demands that we review the evidence supporting the findings under both grounds. *In re C.C.*, No. 06-25-00004-CV, ___ S.W.3d ___, 2025 WL 2147793, at *8 (Tex. App.—Texarkana July 30, 2025, no pet. h.).

This is because termination of parental rights under these grounds may implicate the parent's parental rights to other children. *Id.*; *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (Supp.) (providing as a ground for termination of parental rights that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"). Ground D permits termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which

8

endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Ground E permits termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). Ground D focuses on endangering factors in the child's environment, and ground E focuses on a parent's endangering conduct.

Endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). "'[E]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Boyd*, 727 S.W.2d at 533); *see In re L.E.S.*, 471 S.W.3d at 923. "It is not necessary that the conduct be directed at the child or that the child actually suffer injury." *In re L.E.S.*, 471 S.W.3d at 923.

Under Ground "(E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367). "Further, termination under [Ground] (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regul. Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.))); *see Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 366–67.

9

"Ground E 'refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act.'" *In re R.G.*, No. 06-24-00035-CV, 2024 WL 4142842, at *5 (Tex. App.—Texarkana Sept. 11, 2024, no pet.) (mem. op.) (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "The endangering conduct may also occur 'either before or after the child's removal by the Department.'" *Id.* (quoting *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at *11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.) (citing *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied))). In our analysis under Ground E, we may also consider a parent's failure to complete relevant requirements of a family service plan. *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at *11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.); *In re U.H.R.*, No. 07-18-00318-CV, 2019 WL 81874, at *5 (Tex. App.—Amarillo Jan. 2, 2019, no pet.) (mem. op.).

The evidence at trial showed, and Mother admitted, that she had a long history of drug abuse and that the Department had previously removed three of the children in 2018 because of it. Even so, Mother continued to use drugs while the children were in her care and continued to invite strange men into her home. Mother's methamphetamine was found in Gloria's system, who tested positive for the drug at two years old. Although her children were again removed from her, Mother had two drug arrests during the pendency of the case and missed her court-ordered drug testing, which resulted in presumed positive drug tests. She was found in possession of methamphetamine, Xanax, and ecstasy.

10

"'Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under' Ground E." *In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at *5 (Tex. App.—Texarkana June 19, 2018, no pet.) (mem. op.) (quoting *In re A.L.*, No. 06-14-00050-CV, 2014 WL 5204888, at *7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.) (quoting *Walker*, 312 S.W.3d at 617)). Mother's "failure to remain drug-free while under the Department's supervision will support a finding of endangering conduct under [Ground] (E) . . . ." *Id.* (quoting *In re J.A.W.*, No. 02-08-215-CV, 2009 WL 579287, at *4 (Tex. App.—Fort Worth Mar. 5, 2009, no pet.) (per curiam) (mem. op.) (citing *Vasquez v. Tex. Dep't of Protective & Regul. Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied))). Also, the evidence shows that, after the children's removal, Mother continued to associate with men who possessed drugs. She also had two non-drug-related offenses, including a felony arrest for debit or credit card abuse.

"[I]llegal drug use by a parent . . . supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *In re D.R.*, 631 S.W.3d 826, 834 (Tex. App.—Texarkana 2021, no pet.) (alteration in original) (quoting *In re K.B.*, No. 06-20-00074-CV, 2020 WL 7702179, at *4 (Tex. App.—Texarkana Dec. 29, 2020, no pet.) (mem. op.) (citing *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.) ("[U]nlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under [Ground] D." (second alteration in

11

original) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied))))).

Based on the testimony at trial, the trial court could find, by clear and convincing evidence, that Mother engaged in a course of conduct that endangered the children's physical and emotional well-being and that she knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being.

We overrule Mother's first point of error.

## II.     Sufficient Evidence Supports the Trial Court's Best-Interests Finding

Next, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interests.

### A.      Standard of Review

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re R.G.*, 2024 WL 4142842, at *6 (quoting *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi–Edinburg Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam))). "Termination "'can never be justified without the most solid and substantial reasons.'"" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of a child, courts consider the following *Holley*[2] factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in

---

[2] *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

12

the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 819 (citing *Holley*, 544 S.W.2d at 372); *see In re E.N.C.*, 384 S.W.3d at 807; *see also* TEX. FAM. CODE ANN. § 263.307(b).

The Department is not required to present proof of each *Holley* factor. *See In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied) (citing *In re C.H.*, 89 S.W.3d at 27). "When considering the child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment." *Id.* (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *Id.* (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.)). "[T]he parent's . . . past performance as a parent [is] relevant in determining the child's best interest." *Id.* (citing *In re C.H.*, 89 S.W.3d at 28). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

### B.     The Evidence at Trial

In addition to the evidence recited above, the trial court heard evidence regarding the children's best interests.

Marie Zoungrana, a permanency specialist with 4Kids4Families, testified that Gail, who was seventeen at trial, was placed in a relative's home. Because she was almost an adult, the

13

Department's plan for Gail was to have the Department become her permanent managing conservator so she could remain with the relative until her age of majority. Zoungrana testified that Gable was placed with his father, who gave the Department no concern, and that Gary and Gloria were placed in a stable adoptive home. Zoungrana testified that it was in Gable's best interests to remain with his father, that it was in Gary's best interests to remain in his adoptive home, and that it was in Gloria's best interests to be placed in one of the approved foster placements who wanted to adopt her. Zoungrana agreed that Gail and Gary wanted to return to Mother and that Gable loved Mother and wanted to see her. Zoungrana also said that Mother's last drug test result was negative and that Mother had completed many items of her family service plan and was doing well in the sober living facility.

Mother's godmother, Janet, testified that Gary and Gloria were placed in her home, that they all loved each other, and that the children called her "mom." Even so, Janet said that, at first, Gary would be upset after visits with his Mother because he wanted to go back to his old home but was doing better after Mother moved into a sober living facility and could not visit. According to Janet, when the children first arrived, they would only eat cereal and nothing else, and she had to introduce them to different foods. Janet testified that Gary was seeing a psychiatrist who was helping him. Janet testified that it was in the children's best interests for Gary and Gloria to remain with her because they needed "normalcy" and offered to also take Gail and Gable. She testified that she wanted to adopt the children.

Christie, the children's maternal grandmother, testified that Gail was doing wonderfully in her placement. Even so, Christie believed that all the children should be returned to Mother,

14

who had "improved so much." Christie testified that the children were attached to Mother and that it was not in their best interests for Mother's parental rights to be terminated. Christie noted that the children did well in school, that Mother made sure they did their bookwork, and that even Gloria exhibited advanced knowledge for her age.

Betty, Christie's good friend, testified that Gail was in her care and doing well and that she was willing to be a permanent placement for her. Betty testified that the children were all bonded to Mother, who was bonded to them.

Randy, Gable's father and Gable's placement, testified that Gable's grades had improved since he was first placed with him. Randy said that Gable would act out in school after visits with Mother. Randy believed that Gable should not be made to go through a third CPS removal but also said it would be detrimental to Gable to keep Mother from him if she were sober.

Jackie Starr, the Court Appointed Special Advocate, recommended that all the children remain with their current placements and that Mother's parental rights be terminated because it was the only way "to ensure that these children have stable permanency."

### C. Analysis of the *Holley* Factors

As for the first factor, Gloria was too young to speak her desires. Even so, Mother, Johnson, Zoungrana, Christie, Betty, and Randy all testified that Mother was bonded to the children, who were bonded to her. There was also express testimony that Gail and Gary wanted to return to Mother and Gable would be devastated if he was kept from Mother. As a result, and due to the fundamental interests implicated in terminating a parent-child relationship, we find that the first *Holley* factor weighs in Mother's favor.

15

Next, the emotional and physical needs of Gail, who was almost an adult, was less than those of her siblings, but the record also shows that Gail was found using a "THC vape pen." Janet testified that seven-year-old Gary needed psychiatric treatment, and the record shows that then four-year-old Gloria's and eleven-year-old Gable's physical and emotional needs were great given their young age. The older three children had been previously removed from Mother due to allegations of drug abuse, and the record shows they suffered emotionally from that incident. Even so, the evidence at trial shows that Mother continued to use drugs and physically endangered Gloria, who tested positive for methamphetamine. Mother had placed all four children in danger by using methamphetamine while they were in her care. Mosley testified that methamphetamine use impaired Mother's ability to parent and endangered the children because she could not "pay attention to all of them while being under the influence of methamphetamines." Also, Mother was homeless and unemployed, and "[a] parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs."[3] *In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (alteration in original) (quoting *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.)). We find that the second and third *Holley* factors weigh in favor of terminating Mother's parental rights.

Next, Mother's refusal to provide the names of the strange men coming into her home and her drug use while the children were in her care demonstrates a lack of parental ability.

---

[3]Johnson testified that Mother was required to provide her paycheck stubs to the Department since her family service plan required her to maintain employment, but she failed to do so. According to Johnson, Mother was evicted from her home and failed to provide Johnson with her new address.

Mother missed visits with the children during the pendency of the case and answered, "I don't remember," to the question of whether she was under the influence during her visitations. She also continued to commit crimes during the pendency of the case and was facing felony charges. Accordingly, we find the fourth *Holley* factor weighs in favor of terminating Mother's parental rights.

As for the programs available to assist Mother, the record shows that Mother had a previous CPS case that resulted in the removal of her three oldest children, had been offered a family service plan at that time, and failed to comply with the terms of that family service plan. Johnson testified that she created a new family service plan for Mother in the current case, but that Mother refused to sign the plan, canceled meetings to discuss the plan, and did not complete it. Mother also initially refused the Department's offer to provide daycare for the children. Although Mother had been to inpatient treatment and was in a sober living facility, the trial court could find there was no guarantee of her continued sobriety after she left the facility. In light of Mother's failure to avail herself of the assistance provided by the Department, we find that the fifth *Holley* factor weighs against her.

As for the sixth factor, the Department presented ample evidence of the plans for the children, which consisted of the children remaining in their current placements. Mother, who did not have a home, admitted at trial that she had no place for the children to go if they were returned to her.[4] Accordingly, the sixth *Holley* factor weighs against Mother.

---

[4]Mother testified, "I wouldn't know what my plan would be since it's like I don't know my plan now. I mean, I know where they're at, but you're asking me about something futuristically that far out. I can't think past this point as I'm siting here."

17

As for the remaining factors, "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct." *In re Z.M.*, 456 S.W.3d 677, 689 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 WL 2069281, at *7 (Tex. App.—Waco May 15, 2014, pet. denied) (mem. op.) (citing *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."))). The record shows that Mother's home was unstable due to drug use and because Mother allowed strange men, whom she refused to identify, into her home. Mother's three older children had been previously removed from her and, while being aware of the dangers of another CPS investigation, Mother continued to use methamphetamine, which demonstrated that the existing parent-child relationship was not appropriate. Despite knowing that she had to submit negative drug tests, Mother missed several drug tests, continued to possess illegal drugs, and was arrested four times during the pendency of this case. Mother had no excuse for her drug use or recent criminal activity, which included a pending felony charge. In light of this evidence, we find that the last three *Holley* factors weigh in favor of terminating Mother's parental rights.

After weighing the *Holley* factors, we conclude that legally and factually sufficient evidence supports the trial court's best-interests finding against Mother. As a result, we overrule Mother's last point of error.

18

## III. Conclusion

We affirm the trial court's order.

Charles van Cleef
Justice

Date Submitted: July 17, 2025
Date Decided: August 18, 2025